Michael S. Cryan (SBN 249507)
*michael.cryan@arentfox.com*
Franjo M. Dolenac (SBN 259036)
*franjo.dolenac@arentfox.com*
**ARENT FOX LLP**
555 West Fifth Street, 48th Floor
Los Angeles, CA 90013
Telephone: 213.629.7400
Facsimile:  213.629.7401

Attorneys for Plaintiffs
W.M. JAQUA, LLC and NNIN, LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| W.M. JAQUA, LLC; NNIN, LLC, | Case No. 2:21-cv-00672 |
|---|---|
| Plaintiffs, | **COMPLAINT FOR:** |
| v. | **1. BREACH OF CONTRACT-- EXPRESS; AND** |
| TRANSAMERICA LIFE INSURANCE COMPANY, | **2. BREACH OF CONTRACT-- IMPLIED** |
| Defendant. | **JURY TRIAL DEMANDED** |

Plaintiffs W.M. Jacqua, LLC and NNIN, LLC (collectively, "Plaintiffs"), by and through their undersigned attorneys, file this Complaint against Defendant, Transamerica Life Insurance Company ("Transamerica"), and allege as follows:

## NATURE OF THE ACTION

1.      Plaintiffs bring this action seeking compensatory damages and attorneys' fees based on Transamerica's unlawful increasing of the Monthly Deduction Rates on its in-force universal life insurance policies, including the one owned by Plaintiffs (the "Policy"). By drastically raising the Monthly Deduction Rates on the Policy by 100%, without a proper basis, Transamerica has breached the express and implied terms of the Policy.

2.      The Policy is universal life insurance policy. Broadly speaking, life insurance falls into one of two generic categories: (a) term life insurance; and (b) cash value life insurance.

3.      Term life insurance provides protection for a limited number of years. The insurer pays the death benefit to the policyholder if the insured dies during the stipulated terms (such as 10 or 20 years). If the insured survives the term (*i.e.*, the term expires and the insured is still alive), or if premiums are not paid, the policy expires with no value.

4.      "Cash value" life insurance combines the term insurance component with a savings or "case value" component. Unlike term insurance, cash value life insurance can remain in force for the insured's entire life so long as the policyholder maintains a positive account value. The insurer earns interest on the accumulated value and credits a portion of the interest to the policyholder's account. The insurer uses the accumulated value to fund the death benefit once the policy matures. Whether the insured dies when the policy has a high or low accumulated value, the insurance company pays the same death benefit, equal to the face value of the policy, because the accumulated value is part of the death benefit.

5.      Universal life insurance is a form of cash value life insurance also known as "flexible premium" adjustable life insurance. Like other cash value policies, universal life insurance includes (1) the "mortality" component, for which the insurance company charges a cost to cover the risk of the insured's death (the "cost of insurance"); and (b) a "cash value" component, where premiums paid in excess of the cost of insurance (and certain other policy charges) accumulate (referred to as the "Accumulation Value" in the Policy) and can earn interest at a rate that will not be lower than a "guaranteed minimum interest rate" (generally referred to in the life insurance industry as "guaranteed minimum crediting rate" because the interest is "credited" to the policyholder's account). The Accumulation Value is used to fund the policy charges, including the cost of insurance charges, and it makes up part of the death benefit. In other words, the Accumulation Value is part of the coverage of the life insurance policy. When the insurer pays the death benefit, it makes no distinction between the Accumulation Value and the remaining portion of the death benefit—referred to as the Net Amount at Risk. Indeed, some insurance companies design some universal life insurance policies to be funded in a way that the Accumulation Value equals the death benefit at age 100.

6.      Transamerica held the Accumulation Value for Plaintiffs subject to the terms of the Policy, which prescribe how the Accumulation Value may be used. Policyholders, such as Plaintiffs, may access the Accumulation Value through procedures referred to as withdrawals or partial surrenders. The Accumulation Value may be substantially withdrawn with no penalty if the policyholder has held the policy for longer than a certain number of years, called the "Surrender Penalty Period." Even if the Surrender Penalty Period has not passed, however, a policyholder may access the Accumulation Value subject to a contractually-defined penalty, which is often minimal. The surrender penalty decreases every year until the policy passes the Surrender Penalty Period.

7.    Universal life insurance is designed to give policyholders flexibility, particularly with respect to the payment of premiums. This can be demonstrated by comparing universal life insurance to another type of "cash value" life insurance— whole life insurance. With whole life insurance, a policyholder pays fixed monthly premium payments for the life of a policy. These fixed monthly premium payments include an amount associated with the cost of actual insurance (*i.e.*, the cost for the insurance company to bear the risk of the insured's death) but also an additional amount intended to accumulate a "cash value" that earns interest over time, like the Accumulation Value in a universal life insurance policy. In the insured's earlier years, the fixed premium payments of a whole life policy are typically far higher than the actual cost of the insured's risk of death, and most of the premiums are used to accumulate cash value that will be used to fund the cost of insurance charges in the later years of the insured's life, when the fixed premium payments are likely to be lower than the actual cost of the insured's risk of death. That is, the "cash value" build-up in the earlier years operates as a "reserve" to pay the death benefit in the later years.

8.    Universal life insurance "unbundles" these two components of a whole life insurance policy (a) so that the funding of the policy is transparent to the policyholder, who can see how the insurance company applies the policyholder's premium payments, and how much the company deducts for policy charges and credits as interest to the policy account; and (b) to allow the policyholder to decide how much premium to pay, including choosing whether to pay just enough premiums to cover the risk of death (*i.e.*, pay solely for the life insurance) or pay more (subject to certain limitations) to build up a cash value that earns tax-deferred interest (which, among other things, is used to fund the death benefit and can also be used to pay for the cost of insurance in the future). Notably, interest earned on the Accumulation Value is tax-deferred because the Accumulation Value is considered part of the insurance.

9.      Although there is no fixed monthly premium payment that is due under a universal life insurance policy, if the balance in the policy account is insufficient to cover the policy's monthly charges, which include the cost of the insurance and certain other policy charges, the policy will enter a grace period and lapse unless additional premiums are paid.

10.      Universal life insurance policies have both guaranteed and non-guaranteed elements. Guaranteed elements are fixed and determined at a specific time, such as when the policy was issued. Non-guaranteed elements, on the other hand, are not fixed at a specific time and can be adjusted by the life insurance company under the terms of the policy. An example of a guaranteed element is the guaranteed minimum interest (or crediting) rate. An example of a non-guaranteed element is the Monthly Deduction Rate, which is the rate that Transamerica charges to bear the risk of the insured's death. (Many universal life insurance policies refer to this as the "cost of insurance" rate because it is the rate that the insurance company charges for the mortality risk.)

11.      Although the Policy permitted Transamerica to adjust the Monthly Deduction Rate (by increasing or decreasing it), the Policy limited Transamerica's ability to do so in at least two important ways. First, any change in the Monthly Deduction Rate must have been based on changes to Transamerica's actuarially justified expectations as to future cost factors, such as mortality, expenses, interest, persistency, and applicable federal, state, and local taxes. Second, any change in the Monthly Deduction Rate must have been prospective only: Transamerica could not raise the Monthly Deduction Rate to recoup past losses or make up for prior shortfalls in expected revenue. In no case can the Monthly Deduction Rates exceed the table of guaranteed maximum Monthly Deduction Rates in the policy form.

12.      Transamerica has stated that it increased the Monthly Deduction Rate by 100% based solely on changes in its expectations as to mortality. However, it is highly unlikely that Transamerica's expectations as to future mortality justify any

rate increase at all, much less a rate increase of 100%. That is because it is well-known in the life insurance industry that since Transamerica began issuing the Policy many years ago, mortality has ***improved***, not ***worsened***. Indeed, in 2015, the same year that Transamerica began raising the Monthly Deduction Rate, the National Center for Health Statistics reported that mortality had improved by 16.6% between 2000 and 2014.[1] Transamerica's own mortality experience has been consistent with the national trend.

13.    Transamerica vaguely implied that its rate increase is due in part to the "general interest rate environment." But, as discussed in more detail herein, interest rates should have a relatively minor impact on the Monthly Deduction Rate, and any negative impact they might have on Transamerica's cost of providing insurance should be offset by improved mortality. Furthermore, in its letters citing to the "general interest rate environment," Transamerica expressly referred to declining interest rates dating back to the "mid to late 1990's [*sic*]," which Transamerica emphasized fell below the minimum interest rate guaranteed to policyholders on their policy accounts. Thus, Plaintiffs are informed and believe, and on that basis allege, that Transamerica has imposed its massive rate increase in an unlawful and improper attempt to recover past losses or make up for prior shortfalls in revenue that the company has experienced since the 1990s or early-2000s, and pass on to policyholders the risk and costs associated with guaranteeing them a minimum interest rate, thereby rendering the guaranteed minimum interest rate illusory.

14.    Moreover, by drastically raising the Monthly Deduction Rate by as much as 100%, it is apparent that Transamerica sought to force Plaintiffs and other policyholders either to (a) pay exorbitant premiums that Transamerica knows would no longer justify the ultimate death benefits, or (b) lapse or surrender their policies and forfeit the premiums that they have paid to date, thereby depriving policyholders

---

[1] Sherry L. Murphy, et al., *Mortality in the United States, 2014*, NCHS Data Brief No. 229, 5 (Dec. 2015).

of the benefits of their policies. Transamerica, in turn, will make a huge profit – either through higher premium payments or by eliminating a large group of policies (through lapses or surrenders) and keeping the vast majority of the premiums that have been paid to date on them and releasing the reserves for those death benefit liabilities.

15.    To better understand the basis for Transamerica's sudden and massive rate increase, counsel for other aggrieved policyholders of Transamerica policies asked Transamerica to provide additional information and documents supporting its assertion that its expectations as to future cost factors justified its rate increase, including information and documents reflecting its original mortality and interest assumptions. Transamerica, however, has refused to provide this information, claiming that it is "highly proprietary" and "confidential."

16.    Transamerica's misconduct, as described more fully herein, constitutes not only express breaches of the Policy, but also breaches of the implied covenant of good faith and fair dealing and conversion. Plaintiffs therefore seeks compensatory damages as well as attorneys' fees.

17.    Indeed, in apparent response to complaints about a similar rate increase imposed by another life insurance company, the New York Department of Financial Services ("NYDFS") enacted a regulation to protect policyholders "from unjustified life insurance premium increases."[2] The regulation requires insurers to "establish board-approved criteria for determining non-guaranteed charges or benefits"[3] and would mandate a NYDFS review of "the anticipated experience factors and non-guaranteed elements for reasonableness."[4] The regulation defines applicable

_____

[2] *See* Press Release, NYDFS, *DFS Proposes New Regulation to Protect New Yorkers from Unjustified Life Insurance Premium Increases* (Nov. 17, 2016), https://www.dfs.ny.gov/reports_and_publications/press_releases/pr1611171 (last visited 1/20/21).

[3] N.Y. Comp. Codes R. & Regs. tit. 11, § 48.2(a)(1).

[4] *Id.* tit. 11, § 48.2(f)(3).

experience factors as "expenses, mortality, policy claims, taxes, investment income and lapses."[5] The regulation also prohibits an insurer from increasing profit margins, "unless approved by the superintendent upon a finding that the increase is necessary due to the financial condition of the insurer."[6]

18.    In announcing the proposed regulation in a press release dated November 17, 2016, NYDFS Superintendent Maria Vullo declared that New York "will not stand by and provide life insurers free reign to implement unjustified cost of insurance increases on New Yorkers simply to boost profits."[7]

19.    An article in *The Wall Street Journal* published the same day notes that although the regulation would apply only in New York, it "could be widely copied by other insurance departments."[8]

## THE PARTIES

20.    Plaintiff W.M. Jaqua, LLC was a limited liability company and its members were comprised of two individuals, each citizens of Ohio and Florida, five traditional trusts whose trustees each are citizens of Ohio, Florida, Wisconsin, and South Carolina, and Plaintiff NNIN, LLC. Plaintiff W.M. Jaqua, LLC filed its Articles of Termination with the Missouri Secretary of State on April 5, 2018 and has dissolved, but has filed this lawsuit as part of its wind down efforts.

21.    Plaintiff NNIN, LLC is a limited liability company, and its members are comprised of three traditional trusts whose trustees are each citizens of Ohio. Upon dissolution, W.M. Jaqua, LLC distributed some of its assets to NNIN, LLC, making NNIN, LLC a successor-in-interest to W.M. Jaqua, LLC.

---

[5] *Id*. tit. 11, § 48.2(b)(1).

[6] *Id*. tit. 11, § 48.2(b)(5).

[7] Press Release, NYDFS, *supra* note 2.

[8] Leslie Scism, *New York Regulator Aims to Require Life Insurers Justify Higher Rates on Old Policies*, Wall St. J. (Nov. 17, 2016), http://www.wsj.com/articles/new-york-regulator-aims-to-require-life-insurers-justify-higher-rates-on-old-policies-1479394201 (last visited 1/20/21).

22.     Upon information and belief, Transamerica is an Iowa corporation with its principal place of business located in Cedar Rapids, Iowa. Upon information and belief, Transamerica is authorized to do business in California, and regularly conducts its business within this judicial district. Transamerica is the successor-in-interest to Transamerica Occidental Life Insurance Company.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction over this matter under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity of citizenship between Plaintiff and Transamerica.

24.     This Court has personal jurisdiction over Transamerica because Transamerica purposefully availed itself of the privilege of conducting activities in California and Plaintiffs' claims share a direct nexus with Transamerica's California-related activities, including, upon information and belief, Transamerica designated its Los Angeles office as its marketing office in the Policy; Transamerica's Los Angeles office housed its actuarial department and priced the Policy; Transamerica's Los Angeles employees drafted the Policy's forms, including language in dispute in this matter; Transamerica's Los Angeles office designed, prepared, issued, marketed, and received payments for the Policy; Transamerica signed the Policy in Los Angeles; Transamerica registered with the California Secretary of State to conduct business in California, with a registered agent for service of process in Los Angeles; and Transamerica's Los Angeles employees developed and evaluated the Monthly Deduction Rate increase at issue here.

25.     Venue is proper pursuant to 28 U.S.C. §§ 1391(a)(1), (a)(2), and 1391(b) because, upon information and belief, Transamerica conducts business in the Central District of California, and a substantial part of the events giving rise to the claims occurred in this District, including the foregoing activities.

# FACTUAL ALLEGATIONS

**A.    Plaintiffs Were Owners of Universal Life Insurance Policy Subject to Transamerica's Monthly Deduction Rate Increase.**

26.    Plaintiffs were the owner of the Policy issued in Missouri by Transamerica's predecessor-in-interest, Transamerica Occidental Life Insurance Company, that was subject to Transamerica's Monthly Deduction Rate increase, and is listed below as follows:

| Insured | Policy No. | Issue Date | Init. Face Value | Issue State |
|---|---|---|---|---|
| Jaqua, William M. | 60118388 | Oct. 26, 2003 | $364,870 | Missouri |

27.    A true and correct copy of the Policy is attached hereto as **Exhibit 1** and incorporated by reference.

28.    The insured passed away on December 31, 2017.

29.    Plaintiffs submitted a claim to Transamerica in accordance with the terms of the Policy.

30.    Transamerica paid the death benefit under the Policy to Plaintiffs.

**B.    Transamerica Raises Monthly Deduction Rates**

31.    As is typical of universal life insurance policies, the Policy provided that it would remain in force as long as there were sufficient funds in the policy account each month to cover the monthly policy charges (referred to in the Policy as the "Monthly Deduction"). As stated in the Policy, the Monthly Deduction, which includes the cost of insurance and certain other policy charges/fees, is equal to:

(a)    the Monthly Deduction Rate, times .001, times the difference between the death benefit and the Accumulation Value of the policy (or of each Layer, respectively) at the beginning of the policy month; *plus*

    (b)    the Monthly Deduction for any Riders; *plus*

    (c)    the Policy Fee (which will be waived beginning with the policy anniversary at Age 100); *plus*

    (d)    the monthly expense charge per thousand rate times .001, times the face amount of the policy (or of each Layer, respectively).

Ex. 1 at 14.

32.    Element (a) of the Monthly Deduction formula above is the cost of insurance, which is the largest and most significant charge. As shown above, it is determined by multiplying the Monthly Deduction Rate (the cost of insurance rate) times .001, times the difference between the death benefit and the Accumulation Value of the policy. The rate is multiplied by .001 because the rate is per $1,000 of insurance. Furthermore, the Accumulation Value is deducted from the death benefit because, although the Accumulation Value is part of the death benefit paid upon the insured's death, policyholders do not pay cost of insurance on the Accumulation Value, which is the savings component of the Policy and not the "insurance."

33.    After deducting the Monthly Deduction from the policy account, any balance that is left reflects the ending policy account value or "Accumulation Value," which accrues interest at a rate that cannot be lower than the guaranteed minimum interest rate (4% for the Policy). Ex. 1 at 2. If in any month there are insufficient funds in the account to cover the Monthly Deduction, the policy will enter a grace period. If additional premiums are not paid within the grace period, Transamerica will terminate, or lapse, the policy. The grace period for the Policy is 61 days. Ex. 1 at 10.

34.    The Monthly Deduction Rate under the Policy was based initially on certain characteristics of the insured, including gender, age, and risk class. The Monthly Deduction Rate increased every year as the insured aged.

35.    The Policy states that Transamerica "will determine the Monthly Deduction Rate for each policy month at the beginning of that policy month." Ex. 1 at 14. The Policy further provides:

> Any change in the Monthly Deduction Rates will be prospective and will be subject to our expectations as to future cost factors. Such cost factors may include, but are not limited to: mortality; expenses; interest; persistency; and any applicable federal, state and local taxes.

Ex. 1 at 14. The Policy thus expressly contemplated not only increases in Monthly Deduction Rates but also *decreases* in Monthly Deduction Rates when Transamerica has favorable or improved expectations as to future cost factors.

36.    The Policy further states that Transamerica "do[es] not distribute past surplus or recover past losses by changing the Monthly Deduction rates." Ex. 1 at 25.

37.    Accordingly, among many other things, under the terms of the Policy, any change in the Monthly Deduction Rates (a) could only be based on Transamerica's expectations as to future cost factors; and (b) must be prospective only: Transamerica could not change rates to recover past losses (or distribute past surplus).

38.    In or about June 2015, Transamerica began notifying policyholders that it was raising the Monthly Deduction Rates on certain of its in-force universal life insurance policies. The letter for the Policy is attached hereto as **Exhibit 2**. The letter discloses a rate increase of 100%. The letter also represents that the rate increase applies equally to all policies of a particular policy type (*i.e.*, the rate increase is not limited to a subset of such policies). *See* Ex. 2 ("We are increasing the monthly deduction rates for all TransUltra EX TULTCVALB policies[.]"). Although Transamerica stated generally that it was increasing the Monthly Deduction Rates "based on our current expectation regarding our future costs of

providing this coverage," it did not say what cost factors it was relying upon in support of its rate increase.

39.     In December 2015 and July 2016, counsel for other aggrieved policyholders of Transamerica policies sent letters to Transamerica asking Transamerica to explain the basis for its rate increase, including identifying what cost factors it contended justified the increase and providing documents reflecting the changes in such cost factors. Transamerica's responses to those letters were vague, evasive, and misleading.

40.     For example, in a letter dated March 14, 2016, Transamerica stated that the "general interest rate environment was significantly higher than that of today" and that the "original sales illustration provided at issue projected this policy's performance assuming no change in interest rate throughout the life of the policy." A true and correct copy of the March 14, 2016 letter is attached hereto as **Exhibit 3**. The letter, however, failed to explain how the decline in the "general interest rate environment" over the past 20 years justified an increase in the Monthly Deduction Rate today, especially when the Policy prohibited Transamerica from changing and increasing the Monthly Deduction Rate to recover prior losses.

41.     Furthermore, in responses to other letters from counsel for other plaintiffs, Transamerica provided even less information. For example, when asked what future cost factors justified its rate increase, Transamerica gave no answer, but instead responded by simply repeating the language of the Policy and stating only in very general terms that the future projected policy performance warranted an increase in the Monthly Deduction Rate:

> In exercising its discretion to increase the current monthly
> deduction rates applied to a particular policy plan, Transamerica
> considers numerous factors and evaluates how that group of
> policies is projected to perform in the future. The factors
> considered include, but are not limited to, mortality, expenses,

interest, and federal, state and local taxes. With respect to each of the Policies owned by [GWG DLP Master Trust], Transamerica determined the future projected policy performance warranted an increase in the monthly deduction rates.

*See* August 4, 2016 Letter from Transamerica to counsel for GWG DLP Master Trust (attached hereto as **Exhibit 4**) at 1.

42.     In response to Transamerica's evasive response, GWG DLP Master Trust's counsel again asked Transamerica to identify which specific cost factor or factors it relied on in determining that its "future projected policy performance warranted" an increase in Monthly Deduction Rates.

43.     In other response letters, Transamerica repeated that it considers numerous factors in determining whether to exercise its discretion to increase Monthly Deduction Rates, but for the first time, it identified mortality as the specific cost factor that it relied upon to increase Monthly Deduction Rates for the policies owned by GWG DLP Master Trust: "Specifically, Transamerica's [*sic*] determined that future mortality experience is projected to be less favorable going forward on this block than anticipated at policy inception. As expressly permitted by the Policy, Transamerica increased the Monthly Deduction Rates as a result of this cost factor." *See, e.g.*, **Exhibit 5**, which is a true and correct copy of the Transamerica response letter, dated January 26, 2017.

44.     While Transamerica identified mortality as the specific cost factor, it refused to provide any documents or information supporting its assertion, claiming that the information is "highly proprietary and confidential and includes data on many policies that are owned by other policyholders." Ex. 5.

45.     Because it appears that no one but Transamerica has information about the basis for its rate increase, Transamerica's refusal to provide the information has prevented policyholders like Plaintiffs from verifying the accuracy of

Transamerica's representations that its rate increase is justified by changes in assumptions as to mortality and interest. It is likely for this very reason that NYDFS proposed its new regulation, which would require life insurance companies like Transamerica to notify NYDFS and policyholders in advance of any adverse change in the non-guaranteed elements of an in-force life insurance policy and would mandate regulatory review of the anticipated experience factors, such as mortality and interest.

46.    Regardless, it is apparent that Transamerica's increase in the Monthly Deduction Rate breached the terms of the Policy in at least four ways. *First*, the increase in Monthly Deduction Rate was not based on Transamerica's expectations as to future cost factors. *Second*, the rate increase impermissibly attempted to circumvent the minimum guaranteed interest rate under the Policy. *Third*, the rate increase appears to be an improper attempt to recover prior losses or shortfalls caused by declining interest rates beginning in the mid-1990s. *Fourth*, the rate increase breached the implied covenant of good faith and fair dealing that exists in every insurance contract.

## C.    The Increase in Monthly Deduction Rate Was not Based on Expectations as to Future Cost Factors

47.    The Policy states that Transamerica may base a change in the Monthly Deduction Rates only on changes in its expectations as to future cost factors. These cost factors include mortality, expenses, interest, persistency, and any applicable federal, state and local taxes. To be "subject to" future cost factors, the magnitude of any change in Monthly Deduction Rates must correspond to any changes in future cost factors.

**Mortality**

48.    *First*, Transamerica has relied solely on mortality in increasing the Monthly Deduction Rate.

49.    While mortality is the most significant factor in providing life insurance coverage, it is well known in the life insurance industry that over the past 20 to 30 years, mortality has improved, not worsened, and people are living much longer than anticipated several years ago when Transamerica priced the Policy. For example, in 2015, the National Center for Health Statistics reported "[s]ignificant decreases in mortality in 2014 compared with 2013" and observed that this year-to-year improvement was "consistent with long-term trends."[9] "Although year-to-year changes are usually relatively small," explained the National Center for Health Statistics, "the age-adjusted death rate in the United States decreased 16.6% between 2000 (869.0) and 2014 (724.6)."[10] This "longterm trend" of improving mortality is also evidenced by the release of several new mortality tables over the past two decades that supported a decrease in the Monthly Deduction Rates, not an increase in rates as high as 100%.

50.    Specifically, in 2001, the Society of Actuaries ("SOA") and the American Academy of Actuaries ("AAA") produced the 2001 Commissioner's Standard Ordinary ("CSO") Table, which replaced the previous 1980 CSO Table to reflect significant improving mortality. Upon information and belief, the maximum Monthly Deduction Rate allowed under the Transamerica Policy is based on the older 1980 CSO Table, not the newer 2001 CSO Table. The SOA also is currently investigating an update of the 2001 CSO Table, and a 2015 investigative report by the SOA showed significant reductions in insurance company reserves compared to the 2001 CSO Table due to mortality improvements since 2001. In 2008, the SOA also released a 2008 Valuation Basic Table ("VBT") that reflected significant mortality improvements compared to prior tables. In 2014, the SOA released the 2014 VBT, which showed overall mortality improvement from the 2008 VBT.

---

[9] Murphy, *supra* note 1, at 5.
[10] *Id.*

51.     These new mortality tables demonstrate that since Transamerica originally priced the Policy (as early as the 1980s or 1990s), mortality has improved, not worsened, and this change in mortality would support a *decrease*, not increase, in the Monthly Deduction Rate.

52.     Transamerica's own mortality experience has been consistent with the national trend.

53.     Not only was Transamerica's historical mortality experience favorable, in 2014, Transamerica adopted new mortality assumptions that also were more favorable compared to the mortality assumptions that it used to price policies subject to the rate increases. These new mortality assumptions, too, supported a *decrease*, not an increase, in the Monthly Deduction Rate. Transamerica was determined to raise rates on policyholders to achieve greater profits regardless of what the evidence showed.

54.     Indeed, Transamerica's regulatory filings during the years leading up to the rate increase did not reflect any adverse changes to mortality that would support its rate increase. Each year, life insurance companies file with state insurance departments a Statement of Nonguaranteed Elements, which answers certain interrogatories about the nonguaranteed elements of their policies. Interrogatory No. 4 asks whether Transamerica's "anticipated experience factors underlying any nonguaranteed elements [are] different from current experience." Transamerica's Statements of Nonguaranteed Elements from 2011 to 2015 are attached hereto as **Exhibit 6** to **Exhibit 10**, respectively. In the four years preceding Transamerica's initial rate increase in 2015, Transamerica never once stated that its anticipated mortality was worse than its current experience. *See* Exs. 6-9 (Answers to Interrogatory No. 4). It was not until December 31, 2015 that Transamerica suggested for the first time that it anticipated adverse mortality. Even then, however, Transamerica did not identify mortality specifically, but stated only very generally that "[c]urrent mortality, persistency, investment, tax and expense levels

are generally different from those anticipated in the pricing of some products." Ex. 10 (Answer to Interrogatory No. 4). This statement was made just months before it notified many policyholders, including Plaintiffs, that it was increasing the Monthly Deduction Rates on certain policies, which Transamerica later stated was due solely to less favorable mortality projections, making no mention of "persistency, investment, tax and expense levels," as stated in its most recent Statement of Nonguaranteed Elements. See Ex. 2 (Sep. 2, 2016 Increase Notice Letter notifying of a 100% increase in the Monthly Deduction Rates) and Ex. 5 (Jan. 26, 2017 Letter). It is implausible that in just one year, Transamerica went from anticipating no changes in mortality to anticipated mortality changes that it then claimed justified a 100% increase in the Monthly Deduction Rate.

**Interest**

55.    ***Second***, as to interest, Transamerica has suggested that low interest rates were another reason that it raised the Monthly Deduction Rate on the Policy. *See, e.g.*, Ex. 3.

56.    While "interest" is listed as a cost factor upon which Transamerica may base a change in the Monthly Deduction Rates, Plaintiffs are informed and believe, and on that basis allege, that Transamerica's rate increase is based on a decline in interest rates going back to the mid -to -late 1990s. This historic decline in interest rates cannot be the basis for a change in Monthly Deduction Rates because the Policy required that any change in the Monthly Deduction Rate be subject to Transamerica's expectations as to "future" cost factors, and it prohibited Transamerica from changing the Monthly Deduction Rate to recover past losses. *See infra* section E.

57.    Moreover, even if lower interest rates may impact Transamerica's cost of providing insurance, they would not justify an increase in the Monthly Deduction Rate of 100% because interest rates should be a relatively minor factor in

calculating Transamerica's cost of insurance (and, consequently, its Monthly Deduction Rates).

58.    To begin with, as it relates to Monthly Deduction Rates, "interest" (one of the cost factors that Transamerica may consider) can only refer to the interest that Transamerica earns (or expects to earn) on its profits from providing insurance, and not on funds in its policyholders' accounts. As explained above, universal life insurance policies, like the Policy, consist of two distinct components – (a) the life insurance, or "mortality," component; and (b) the Accumulation Value, or "savings," component. Transamerica earns interest on both of these components.

59.    However, although a life insurance company may earn interest on both the mortality component and the savings component, it can only consider interest that it earns on the mortality component when determining the ***cost of insurance***; the interest that it earns from investing funds in policyholder accounts is only relevant to setting the interest rate credited to those accounts. This is because the cost of insurance is the mortality charge. It is intended to cover the risk of the insured's death, not the interest rate risk associated with policyholder accounts (and guaranteeing policyholders a minimum interest rate on their policy accounts).

60.    The cost of insurance charge includes an expected profit over the insurance company's expected mortality. The insurance company then expects to invest this profit and earn interest on it. The company then factors this profit and the interest on this profit in setting the cost of insurance rates (or, here, the Monthly Deduction Rates). Lower interest rates may result in lower interest income, but lower interest rates would not result in a loss unless the insurance company's investments had a negative return. But this is highly unlikely to occur because most life insurance companies invest primarily in fixed-income securities, such as bonds. Thus, to the extent that Transamerica is raising the Monthly Deduction Rates because it is earning less interest on its mortality profits, it is highly unlikely that

this lower interest income would justify an increase in the Monthly Deduction Rates, much less one as high as 100%.

61.     To illustrate this, assume Transamerica's cost of insurance contemplated a 20% mortality profit. For every $120 in cost of insurance charges received in a year, Transamerica would expect to pay out $100 in claims, leaving $20 in mortality profits to invest. If Transamerica assumed that it would earn 5% interest on the profit of $20 in that year, it would expect to earn $1.00 of interest. If Transamerica now expects to earn 1% instead of 5%, the interest would drop to $0.20 instead of $1.00. But this 80% drop in interest income would not translate to an 80% increase in Monthly Deduction Rates because it does not capture the $20 mortality profit. In other words, Transamerica is earning $20.20 instead of $21.00 on the mortality component, which is a difference of less than 4%, assuming mortality is as expected. If Transamerica experienced favorable mortality, that favorable mortality experience should also offset the cost associated with the lower than expected interest. Although this is a very rudimentary example, it illustrates how a decline in interest is not likely to result in a rate increase as high as 100%.

62.     As to the interest earned on the savings component of a universal life insurance policy, a life insurance company expects to earn a spread on the funds that policyholders maintain in their policy accounts. That is, if the life insurance company is earning 8% interest on policyholder accounts, it may credit policyholders 7% and earn a spread of 1%. If interest rates are low and the company is earning only 5% interest, it may lower the crediting rate to 4% and still earn a 1% spread. Thus, even if Transamerica could consider the interest it earns from investing funds in policyholders' accounts (which it cannot), this would not justify an increase in Monthly Deduction Rate, but only a change in the interest rate credited to policyholder accounts.

63.     However, if Transamerica expects to earn only 3% interest from investing funds in policyholders' accounts, Transamerica cannot reduce the

crediting rate to 2% because this rate would be below the 4% guaranteed minimum interest rate credited to policyholders. Nor, however, can Transamerica attempt to offset this loss by raising the Monthly Deduction Rate. If it could, the cost of insurance (which is calculated by using Monthly Deduction Rates) would not be a mortality charge, but a way for Transamerica to guarantee its profitability on the Policy by transferring to policyholders all risk under the Policy, including the interest rate risk on Policy Accumulation Values and the risk of interest rates falling below the guaranteed minimum interest rate. This would render the guaranteed minimum interest rate meaningless.

64.   Furthermore, even if Transamerica is properly considering only interest on its mortality profits, to the extent Transamerica is raising Monthly Deduction Rates to achieve its original profit expectations, the rate increase was improper because Transamerica cannot raise Monthly Deduction Rates simply to guarantee itself its original profit expectations. As the NYDFS has said, life insurance companies do not have free reign to raise COI rates "simply to boost profits" because profit margin is not an experience factor.[11]

65.   In light of this, and given the magnitude of Transamerica's rate increase, Plaintiffs are informed and believe, and on that basis allege, that Transamerica has imposed the rate increase, not because its mortality and interest experience has been unfavorable enough to require an increase in Monthly Deduction Rate, but solely to boost its profits. Profit is not a factor that Transamerica could consider in changing the Monthly Deduction Rate. Furthermore, using Monthly Deduction Rates to guarantee Transamerica's original profitability assumptions, and thereby placing its interest in maximizing gains over the rights of policyholders, would constitute a breach of the implied covenant of good faith and fair dealing.

---

[11] Press Release, NYDFS, *supra* note 2.

66.    In sum, by drastically raising the Monthly Deduction Rate on the Policy, Transamerica sought to force Plaintiffs either to (a) pay exorbitant premiums that Transamerica knows would no longer justify the ultimate death benefits, or (b) lapse or surrender their policies, thereby forfeiting the premiums that they have paid over the last decades. Transamerica, in turn, will make a huge profit – either through higher premium payments, or by eliminating a large group of policies (through lapses or surrenders), releasing reserves for those policies, and keeping the premiums that have been paid to date. As the NYDFS Superintendent stated in regards to NYDFS's proposed regulation to address this very issue: "DFS will not stand by and provide life insurers free reign to implement unjustified cost of insurance increases . . . on New Yorkers simply to boost profits."

**D.    The Increase in the Monthly Deduction Rate Was an Impermissible Attempt to Circumvent the Guaranteed Minimum Interest Rate**

67.    Under the express terms of the Policy, Plaintiffs had the right to pay just enough premiums to cover the Monthly Deduction. If Plaintiffs contributed more than needed to cover the Monthly Deduction, leaving a balance remaining in the policy account, the Policy provided that the balance would accrue interest at a rate no lower than the guaranteed minimum interest rate. Ex. 1 at 13. The guaranteed minimum interest rate provided for under the Policy was 4%.

68.    Transamerica has suggested that low interest rates were at least one reason for its increase in the Monthly Deduction Rates. To the extent that Transamerica considered the interest that it earns on funds in policyholder accounts, the rate increase also violated the Policy's guaranteed minimum interest rate provision. This is evident because if the interest that Transamerica earned on funds in policyholder accounts did not drop near or below the guaranteed minimum interest rate that it credits to policyholders, Transamerica could simply address the change in interest rates by lowering the interest rate credited to policyholders. But if Transamerica is raising Monthly Deduction Rates instead of lowering the interest

rate credited to policyholders, this presumably is because lowering the interest rate credited to policyholders would not be sufficient for Transamerica – because it is earning interest near or below the guaranteed minimum interest rate (thus, reducing its originally anticipated spread). By raising the Monthly Deduction Rate to account for this, however, Transamerica tried to do indirectly what it could not do directly: it used the Monthly Deduction Rate to achieve an interest crediting rate that is lower than the guaranteed minimum interest crediting rate, which violated the Policy.

69.    In short, Transamerica tried to take the "guarantee" out of the guaranteed minimum interest rate. By depriving Plaintiffs of the right to the guaranteed minimum interest rate, Transamerica breached not just the express terms of the Policy, but also the implied covenant of good faith and fair dealing.

**E.    Attempting to Recoup Prior Losses**

70.    The Policy also states that Transamerica "do[es] not distribute past surplus or recover past losses by changing the Monthly Deduction Rates." Ex. 1 at 25.

71.    Not only was Transamerica's increase in the Monthly Deduction Rates not based on changes in future cost factors, but by basing the rate increase on interest rates that have existed since the mid -to -late 1990s, the rate increase also was intended to recover past losses or profit shortfalls since that time. The rate increase therefore violates the requirement under the Policy that any rate increase be prospective and the prohibition that Transamerica not change the Monthly Deduction Rate to recover past losses.

## COUNT I

### (Breach of Contract – Express)

72.    Plaintiffs reallege the allegations contained in the foregoing paragraphs as if set forth fully herein.

73.    The Policy is a binding enforceable contract.

74.    Transamerica materially breached the Policy in several respects, including but not limited to the following:

a.    By increasing the Monthly Deduction Rate on a basis other than changes to Transamerica's expectations as to future cost factors;

b.    By increasing the Monthly Deduction Rate in an attempt to circumvent the guaranteed minimum interest rate;

c.    By increasing the Monthly Deduction Rate in an attempt to recover past losses or make up for prior shortfalls in expected revenue; and

d.    By imposing excessive an Monthly Deduction Rate, including by failing to lower the Monthly Deduction Rate.

75.    Plaintiffs performed all of their obligations under the Policy, except to the extent that Plaintiffs' obligations were excused by Transamerica's wrongful conduct as alleged herein.

76.    As a direct and proximate cause of Transamerica's material breaches of the Policy, Plaintiffs were damaged as alleged herein in an amount to be proven at trial, but in any event in an amount that exceeds $75,000, exclusive of interest and costs.

## **COUNT II**

### **(Breach of Contract – Implied)**

77.    Plaintiffs reallege the allegations contained in the foregoing paragraphs as if set forth fully herein.

78.    The Policy is a binding and enforceable contract.

79.    The Policy includes an implied covenant, actionable in contract, that Transamerica will act in good faith and deal fairly with Plaintiffs.

80.    Transamerica materially breached the Policy in several respects, including but not limited to:

a.    Charging excessive Monthly Deduction Rates, thereby denying Plaintiffs the benefits of its actual policy Accumulation Values;

1          b.  Considering interest that it earns on policyholder accounts, as opposed

2   to interest only from its mortality profits, in raising the Monthly Deduction Rate;

3          c.  Increasing the Monthly Deduction Rate in an attempt to achieve

4   Transamerica's original expected profitability for the Policy at Plaintiffs' expense;

5          d.  Improperly targeting its rate increases at policyholders, including

6   Plaintiffs, who chose to exercise their right to fund their policies as they wanted;

7          e.  Increasing the Monthly Deduction Rate to circumvent the guaranteed

8   minimum interest rate under the Policy;

9          f.  Attempting to force Plaintiffs either to (i) pay exorbitant premiums that

10   Transamerica knows would no longer justify the ultimate death benefits, or (ii) lapse

11   or surrender the Policy, thereby forfeiting the premiums paid to date;

12          g.  Failing to lower the Monthly Deduction Rate; and

13          h.  Failing to provide meaningful disclosures about the increase in the

14   Monthly Deduction Rate.

15       81.    Plaintiffs performed all of their obligations under the Policy, except to

16   the extent that Plaintiffs' obligations were excused by Transamerica's conduct as

17   alleged herein.

18       82.    Transamerica's breaches were conscious, deliberate, and unreasonable

19   acts, which were designed to and which did unfairly frustrate the agreed common

20   purposes of the Policy and which disappointed Plaintiffs' reasonable expectations

21   by denying Plaintiffs the benefits of the Policy.

22       83.    As a direct and proximate cause of Transamerica's material breaches

23   of the implied covenant of good faith and fair dealing, Plaintiffs were damaged as

24   alleged herein in an amount to be proven at trial, but in any event in an amount that

25   exceeds $75,000, exclusive of interest and costs.

26   ///

27   ///

28   ///

# **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

1.     Awarding Plaintiffs compensatory damages in an amount to be determined at trial;

2.     Awarding pre-judgment and post-judgment interest;

3.     Awarding the costs of the suit herein incurred, including reasonable attorneys' fees to the extent permitted by law;

4.     Any other and further relief as the Court may deem just and proper under the circumstances.

Dated:  January 25, 2021                              Respectfully submitted,

                                                      ARENT FOX LLP


                                                      By:    */s/ Franjo M. Dolenac*
                                                             Michael S. Cryan
                                                             Franjo M. Dolenac

                                                      Attorneys for Plaintiffs
                                                      W.M. JAQUA, LLC and NNIN, LLC

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

Dated:  January 25, 2021                           Respectfully submitted,

                                                   ARENT FOX LLP


                                                   By:_____*/s/ Franjo M. Dolenac*_____
                                                        Michael S. Cryan
                                                        Franjo M. Dolenac

                                                   Attorneys for Plaintiffs
                                                   W.M. JAQUA, LLC and NNIN, LLC